UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NO MUHAMED, | No. C 06-512 MHP (pr) |
| Petitioner, | **ORDER DENYING HABEAS PETITION** |
| v. | |
| ANTHONY P. KANE, warden, | |
| Respondent. | |

## INTRODUCTION

No Muhamed, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

No Muhamed was convicted in Orange County Superior Court of second degree murder and was sentenced in 1994 to 15 years to life in state prison plus a one-year enhancement for use of a firearm.[1] Muhamed's habeas petition does not concern that conviction directly, but instead focuses on an September 9, 2004 decision by a panel of the Board of Prison Terms (now known as the Board of Parole Hearings ("BPH")) finding him not suitable for parole.

The BPH identified several factors in support of its determination that Muhamed was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he was released. The factors identified included the circumstances of the

1

crime, his criminal and social history, his limited in-prison programming, and his inadequate parole plans. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Muhamed sought relief in the California courts. The Orange County Superior Court denied his petition for writ of habeas corpus in 2005 in a reasoned order. Resp. Exh. 8. The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review. Resp. Exhs. 9 and 10.

Muhamed then filed his federal petition for writ of habeas corpus. The court construed the federal petition for writ of habeas corpus to allege a due process violation based on the alleged absence of some evidence to support the BPH's decision. Respondent filed an answer and petitioner filed a traverse. The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because Muhamed was incarcerated and the challenged action occurred at a prison in Soledad in Monterey County, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

1  The petition may not be granted with respect to any claim that was adjudicated on the merits
2  in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that
3  was contrary to, or involved an unreasonable application of, clearly established Federal law,
4  as determined by the Supreme Court of the United States; or (2) resulted in a decision that
5  was based on an unreasonable determination of the facts in light of the evidence presented in
6  the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S.
7  362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner
8  challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d
9  1123, 1126-27 (9th Cir. 2006).

10  The Orange County Superior Court's decision is the last reasoned decision, and
11  therefore is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797,
12  803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126
13  S. Ct. 2041 (2006).

14  **DISCUSSION**

15  A.   Due Process Requires That Some Evidence Support A Parole Denial

16  A California prisoner with a sentence of a term of years to life with the possibility of
17  parole has a protected liberty interest in release on parole and therefore a right to due process
18  in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v.
19  Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442
20  U.S. 1 (1979); Cal. Penal Code § 3041(b).

21  A parole board's decision satisfies the requirements of due process if "some evidence"
22  supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for
23  disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To
24  determine whether the some evidence standard is met 'does not require examination of the
25  entire record, independent assessment of the credibility of witnesses, or weighing of the
26  evidence. Instead, the relevant question is whether there is any evidence in the record that
27  could support the conclusion reached'" by the parole board. Id. at 1128 (quoting
28  Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and

3

assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

A critical issue in parole denial cases concerns the BPH's use of evidence about the crime that led to the conviction. Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 479 F.3d 658 (9th Cir. 2007). Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Recently, Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases

1  (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a
2  prisoner unsuitable for parole solely on the basis of his commitment offense comports with
3  due process, the decision was made before the inmate had served the minimum number of
4  years required by his sentence." Irons, 479 F.3d at 665; see e.g., id. at 660 (inmate in 16th
5  actual year of his 17-to-life sentence).

6       The message of these three cases is that the BPH can look at immutable events, such
7  as the nature of the conviction offense and pre-conviction criminality, to predict that the
8  prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight
9  to be attributed to those immutable events should decrease over time as a predictor of future
10  dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and
11  Irons). Sass did not dispute the principle that, other things being equal, a criminal act
12  committed 50 years ago is less probative of a prisoner's current dangerousness than one
13  committed 10 years ago. Not only does the passage of time in prison count for something,
14  exemplary behavior and rehabilitation in prison count for something according to Biggs and
15  Irons. Superintendent v. Hill's standard might be quite low, but it does require that the
16  decision not be arbitrary, and reliance on only the facts of the crime might eventually make
17  for an arbitrary decision.

18       Having determined that there is a due process right, and that some evidence is the
19  evidentiary standard for judicial review, the next step is to look to state law because that sets
20  the criteria to which the some evidence standard applies. One must look to state law to
21  answer the question, "'some evidence' of what?"

22  B.    State Law Standards For Parole For Murderers In California

23       California uses indeterminate sentences for most non-capital murderers, with the term
24  being life imprisonment and parole eligibility after a certain minimum number of years. A
25  first degree murder conviction yields a base term of 25 years to life and a second degree
26  murder conviction yields a base term of 15 years to life imprisonment. See In re
27  Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal
28  Code § 190. The upshot of California's parole scheme described below is that a release date

normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[2] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence

puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires the prisoner first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole"). The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

C. Some Evidence Supports The BPH's Decision In Muhamed's Case

The BPH found Muhamed unsuitable for parole based on the circumstances of the murder, his prior criminality and social history, his limited in-prison programming, and his inadequate parole plans.

1. Commitment Offense

Although Muhamed did not fire the fatal shot, he was among the group of 5 gang-members that sought out and attacked the victim to retaliate for a gang-related slight. The facts of the killing were described in the life prisoner evaluation report:

7

> On September 18, 1992, victim Angel Gonzalez was attacked by Trieu Nguyen Dao ('Jimmy,' age 20), Sieu Phony Ngo ('Tom', age 19), No Muhamed ('Noodle', age 19), Asat Cham ('Chucky', age 16), and Usumang Muhamed ('Goose' or 'Gooseman', age 18) in Fullerton. It was reported that the victim was knocked to the ground and shot once in the back. Gonzalez died at the scene.
>
> Subsequent investigation revealed that the group of Asians (affiliated with the 'Fullerton Boys' [F.B.] gang) were seeking retaliation against the 'Fullerton Tokers Town' (F.T.T.), a Latin gang. A rock with a note had been thrown through the window of Cham which stated, "I'm going to kill you Fullas F.T.T.R. # 1, just watch out asshole your dead." On September 18, 1992, it was reported that an argument between Angel Gonzalez (victim) and an Asian male, later identified as No Muhamed had occurred at a McDonald's restaurant, one block west of Fullerton High School. Witnesses stated that No Muhamed and Angel Gonzalez went chest to chest with No Muhamed claiming 'F.B.' and Angel Gonzalez claiming 'F.T.T.' There was a group of Asian males with No Muhamed. Later that afternoon, approximately 3:07 p.m., Angel Gonzalez was walking home from Fullerton High School when he was attacked by a group of male Asians two blocks from the high school. Angel Gonzalez was knocked to the ground (in a grass area) and beaten by these individuals. During the beating, Angel Gonzalez was shot once in the back and died at the scene as a result of that gunshot wound.

Resp. Exh. 4, p. 1. The attackers fled to the state of Washington. Some of the attackers were later apprehended in Washington. Id. at 1-2. Muhamed was apprehended in California three months after the attack and his brother turned himself in about eleven months after the attack. Id. at 2.

Muhamed's version, as recounted in the board report, Angel Gonzalez hit him first and they fought but were separated at the encounter earlier in the day at the McDonald's restaurant. He stated that he, his brother and his friends went to find Angel after school to talk to him to ask why he wanted to start trouble. He got in another fight with Angel, his friends joined in to assist him, and the gun his brother was carrying went off accidentally when his brother went to hit Angel with the gun. Muhamed stated that, until that moment, he did not know his brother had a gun with him. Id. "Muhamed admitted that he had a temper and was made about the way Angel had looked down on him." Id.

A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled

8

or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2402(c)(1).

The BPH relied on the commitment offense to deny parole, finding that it was "really a callous offense," as the 15-year old victim was "jumped on, knocked to the ground, beaten up and shot in the back by a group of people." RT 47. "And certainly demonstrates an exceptional violent disregard for human suffering. And the motive for this crime was gang affiliation." Id.

The BPH identified more than the minimum elements of second degree murder as it indicated that Muhamed and his gang regrouped after an earlier encounter, went in search of the victim, and beat him before shooting him in the back. Cf. Dannenberg, 34 Cal. 4th at 1071; In re Rosenkrantz, 29 Cal. 4th at 682-83. Muhamed may not have fired the fatal shot but certainly was in the thick of things: it was he and the victim who had the earlier fight at McDonald's, and it was he who threw the first punch in the second encounter that culminated with his brother shooting the victim. He was one of five members of his gang who went in pursuit of the victim, and the BPH rightly saw this as a very callous offense. The circumstances of the murder provided sufficient evidence alone to deny parole 10-11 calendar years into Muhamed's 15-to-life sentence. The BPH was not required to credit Muhamed's statement that he did not know his brother was armed until the shots were fired or his statement that the gun discharged accidentally when his brother tried to hit the victim with it. Muhamed knew that his fellow gang members carried guns sometimes. RT 37-38. As will be seen below, Muhamed was involved in another incident where he claimed to have merely been present when someone else fired a gun. And as also will be seen below, this was not the only time Muhamed was involved in an incident in which a group of people ganged up to assault a single victim. The circumstances of the murder showed his unsuitability for parole.

9

2.     Prior Criminality And Social History

The BPH is directed by the regulation to consider all relevant and reliable information in determining suitability for parole, including the prisoner's "past criminal history, including involvement in other criminal misconduct which is reliably documented." 15 Cal. Code Regs. § 2402(b). Among the specific circumstances listed as tending to indicate unsuitability is a previous record of violence, such as if the prisoner had "on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." 15 Cal. Code Regs. § 2402(c)(2).

Muhamed had a criminal history before the commitment offense. He had been arrested in 1990 for attempted murder and assault with a deadly weapon. RT 15. The case was resolved with a conviction for assault with a firearm and a sentence of 333 days in jail and 36 months on probation. That conviction stemmed from an incident where he was present in a car when his friend in the car shot at people in another car. See RT 15; Resp. Exh. 3, p. 11.

There was plenty of evidence that Muhamed was involved in a street gang before his incarceration. As the state superior court explained, "[c]onsidering the fact the offense was committed as a result of a confrontation between rival gangs, the Board reasonably relied on petitioner's gang participation as relevant information having a bearing on petitioner's current suitability for parole." Resp. Exh. 8, p. 3. His gang membership also indicated an unstable social history.

The BPH considered a circumstance proper under California law in finding that Muhamed's criminal record showed he was unsuitable for parole. The fact that the commitment offense was committed while he was on probation indicated he had failed to profit from society's previous attempts to correct his criminality. Muhamed's prior criminality and gang activity were part of the overall picture of him that the BPH properly considered in determining whether he was suitable for parole.

### 3. Institutional Performance

Section 2402(b) specifically allows the BPH to consider a great range of relevant and reliable information, such as the prisoner's social history and mental state. The BPH also may consider evidence that the "prisoner has engaged in serious misconduct in prison or jail" as tending to indicate unsuitability for parole. 15 Cal. Code Regs. § 2402(6).

The BPH stated that another reason in support of its decision to deny parole was that Muhamed "had programmed in a limited manner" and had not participated in beneficial self-help. See RT 48, 50. Although Muhamed had no serious disciplinary problems since he arrived in the CDC system and had obtained his GED, the BPH thought he was lacking in ambition and was doing just the minimum necessary to get by. See RT 24-27. He had participated in a weekly meditation session. He had received generally satisfactory work grades but not many above-average or excellent grades. He also had not completed a vocational training course; he said he was on a waiting list but didn't know many details about the waiting list. See RT 29. The BPH stated that his work on Impact and a little bit of AA/NA and a workshop was not very impressive for the amount of time he had been in prison. See RT 29. Muhamed's arguments in his traverse that he had done further work since the hearing are irrelevant to the sufficiency of the evidence to support the BPH's decision at the 2004 hearing.

The BPH's concern with Muhamed's self-help programming was enhanced by evidence that caused concern about his gang tendencies. Although the 2002 psychological report was favorable, the 1996 psychological report was not. The evaluator in 1996 wrote that Muhamed "is superficially sincere" and presents himself in a very different light than his correctional file suggests: "from the correctional file one would suspect that [Muhamed] is a hard-core gang member with definite violent tendencies and antisocial proclivity." Resp. Exh. 7, p. 2. The BPH could consider the inmate's "past and present mental state." See 15 Cal. Code Regs. § 2402(b). In addition to the gang-related killing, he was present on another occasion with two other people when one of them shot from his car at people in another car, and he had been involved in a group attack at the county jail in 1993, as well as an individual

11

fight in the county jail in 1993. In the first county jail incident – which Muhamed did not dispute but professed not to recall – the record showed that he and some other Vietnamese inmates attempted to attack another inmate's face with a razor and kicked and punched that inmate. RT 39-40; Resp. Exh. 3, p. 13. In the second county jail incident, Muhamed was involved in mutual combat with another inmate. See RT 40. His gang membership plus presence/participation in several attacks provided plenty of evidence for the parole authority to be concerned and desirous of being certain that he was no longer criminally oriented. The BPH's concern about the limited amount of programming Muhamed had done was supported by evidence and provided a reason to find him unsuitable.

### 4. Parole Plans

The prisoner's parole plans can be considered by the BPH. Among the circumstances listed as tending to show suitability are the existence of realistic plans for the release or the development of marketable skills that can be put to use upon release. See 15 Cal. Code Regs. § 2402(d)(8). Section 2402(b) allows the BPH to consider "any other information which bears on the prisoner's suitability for release."

There was some evidence to support the BPH's reliance on the absence of adequate parole plans. The BPH noted that Muhamed's parole plans were "definitely lacking and need[] to be firmed up." RT 49. Although Muhamed planned to live with his mother, he had no employment offers lined up and had not completed any vocational courses in prison. The BPH could reasonably be concerned about paroling a prisoner who had once been actively involved in a street gang who now wanted to go on parole with no job lined up and no vocational certification. This factor alone may not support the denial of parole but could be considered as one part of the overall picture that showed Muhamed was not suitable for parole. See 15 Cal. Code Regs. § 2402(b).

### 5. There Was Enough Evidence To Support The Decision

The weight to be attributed to the commitment offense and pre-conviction criminality may fade over time as a predictor of current dangerousness, but the prisoner here was only 10-11 years into his 15-to-life sentence. The commitment offense, plus Muhamed's pre-

1 incarceration gang activity and other crime, plus his lackluster programming, plus his lack of
2 real parole plans, provided enough evidence for the BPH to find him unsuitable for parole in
3 2004. This is not a close call.

The Orange County Superior Court correctly identified the "some evidence" standard as the standard for judicial review of BPH decisions and reasonably applied it to determine that there was sufficient evidentiary support for the BPH's conclusion that Muhamed was not suitable for parole. See Resp. Exh. 8. The Orange County Superior Court's rejection of Muhamed's insufficient evidence claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard. He is not entitled to the writ.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: May 31, 2007

Marilyn Hall Patel
United States District Judge

## **NOTES**

1. Muhamed received a sentence enhancement under California Penal Code § 12022(a)(1) which allows for a one-year sentence enhancement if any of the principals in the offense are armed with a firearm.

2. The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).